UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **Kathy Packett,**<br><br>**Plaintiff,**<br><br>v.<br><br>**Capital One Services, LLC,**<br>**Capital One Financial Corporation, and**<br>**Capital One, National Association,**<br><br>**Defendants.** | **CIVIL ACTION NO.**  3:21cv10 |

## COMPLAINT

Plaintiff Kathy Packett, ("Plaintiff" or "Packett"), respectfully moves for judgment against Defendants Capital One Services, LLC, Capital One Financial Corporation and Capital One, National Association, (collectively "Capital One" or "Defendants"):

### Introduction

1. This is a claim for relief pursuant to Older Workers Benefits Protection Act (OWBPA), and subject to this Court's ruling on the OWBPA claim, should Plaintiff prevail on such claim, then Plaintiff asserts a corresponding claim under the Age Discrimination in Employment Act (ADEA). Plaintiff was employed by Capital One, and upon her termination signed a "Letter of Agreement" purporting to release her claims under ADEA. Plaintiff alleges that she was terminated pursuant to an employment termination program and that the Letter of Agreement failed to comply with the OWBPA requirement of 45-day consideration period and a listing of names and job titles of others affected by the program. Plaintiff is entitled to keep her

severance payment and sue Capital One for age discrimination. *Oubre v. Entergy Operations*, 522 U.S. 422 (1998). Plaintiff may sue for an OWBPA violation. *Krane v. Capital One*, 314 F. Supp. 2d 589 (E.D.Va. 2004) (Payne, J.). In conjunction with a Court determination that the Letter of Agreement did not comply with OWBPA and, conditioned on such finding, plaintiff seeks relief for age discrimination under ADEA.

2.  Although Plaintiff intended to bring this as a collective action under 29 U.S.C. § 216(b), the Court's decision on June 8, 2020 in *Hutchens v. Capital One Services, LLC, et al.*, Case No. 19-cv-546 precludes such an action because the identical "Letter of Agreement" that Plaintiff signed was at issue in *Hutchens* for which this Court held that plaintiff could not proceed collectively. If this Court or a higher Court ultimately reverses the *Hutchens* holding and allows a collective action to proceed, then Plaintiff will join with the plaintiff in *Hutchens* and other similar cases in order to proceed collectively against Defendants, and Plaintiff reserves the right to amend this Complaint accordingly. (Packett also has a related action for FLSA violations pending against the same defendants, *Packett v. Capital One Services, LLC*, Case No. 3:20-cv-404-MHL).

## Jurisdiction and Venue

3.  This Court has jurisdiction for the ADEA claims pursuant to 29 U.S.C. § 216(b) as incorporated by 29 U.S.C. § 626(b), and under 29 U.S.C. § 626(c), in that the Plaintiff may bring this action in any appropriate United States District Court.

4.  Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5.  Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

## Parties

6. Packett is a resident of Virginia who was employed by Capital One most recently as a "Senior Associate." Plaintiff was an "employee" as defined in the ADEA.

7. Capital One Services, LLC is a Virginia limited liability company, which has its principal office in Virginia.

8. Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

9. Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

10. On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent. Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants. Defendants are an "employer" as defined by the ADEA.

## Factual Allegations

11. Packett was hired by Capital One in 1997.

12. Packett worked at Capital One's West Creek office in Goochland County, Virginia.

13. During the time frame relevant to this lawsuit, Packett worked in the Branded Card Servicing ("BCS") Department as a "Senior Extended Operations Associate" for Capital One.

**Performance Management**

14. Capital One has five categories for its performance evaluation ratings scale: Exceptional, Very Strong, Strong, Inconsistent, Action Required.

15. Capital One informally refers to the five categories as five "buckets."

16. As part of the evaluation process each year, Capital One employees are issued an overall rating which places them within one of the five "buckets." This overall rating consists of two areas: "Results" (which are generally objective metrics) and "Competencies" (which consist of subjective criteria such as "communications," and "lives the values").

17. During Plaintiff's employment with Capital One, Packett consistently received strong performance evaluations.

**Policy to Increase "Involuntary Attrition"**

18. Capital One claims to hire the best and brightest associates available. For example, Chief Information Officer (CIO) Rob Alexander stated in a blog post on July 19, 2017 that Capital One has a "best people philosophy," which involves hiring the "best talent in the industry."

19. During the relevant time period, Capital One implemented a policy that sought to increase Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination.

20. In order to carry out Capital One's new policy to increase "involuntary attrition" it changed or implemented other personnel policies, including:

    a. Prohibiting employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy);

    b. Changing from a "performance management" distribution that was a

"guide" or "aspirational" distribution (previously as low as 5% in the bottom two "buckets"), to a <u>mandatory</u> forced distribution;

      c.     Changing the prior policy which only required a "coaching plan" or PIP for employees in the "Action Required" bucket, to now also requiring a coaching plan or PIP for all employees who are rated in the "Inconsistent" bucket.

21.     The No-Transfer policy that went into effect was that any employee rated "Inconsistent" was prohibited from transferring to another role within Capital One without special dispensation from a VP-level executive. Individual discretion of managers to accept transfers of employees rated "Inconsistent" was prohibited. Previously employees rated "Inconsistent" were allowed and encouraged to find other roles within Capital One (based on its "best people philosophy"), and the hiring managers had wide discretion to approve, and routinely did approve, such transfers.

22.     The most significant change in Capital One policy was that it intentionally sought to increase its rate of "involuntary" terminations.

23.     Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

24.     At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job eliminations (known within Capital One as "restructuring").

25.     Upon information and belief, Capital One required its managers to involuntarily terminate a set percentage of its employees across all business units.

26.     The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One.

27. "Performance Management" was the primary means by which this central policy of increasing "involuntary attrition" rates was implemented.

28. At Capital One the term "distribution" means the range of performance ratings set for each "bucket" of performance. Previously the "distribution" percentages set for each "bucket" was aspirational. During the relevant time period of this lawsuit, Capital One's "distribution" percentages were mandatory.

29. This "Performance Management" policy of forcing managers to rank a fixed percentage of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

30. Under the guise of "Performance Management," the Executive Committee (EC) members, (the highest echelon of executive leadership at Capital One), determined the specific forced "distribution" percentages applicable to their lines of business. Managers within those lines of business had to meet the forced distribution resulting in a fixed percentage of employees ending up in each of the performance "buckets" as pre-determined by the EC executive.

31. From the bottom two "buckets," employees were placed on "coaching plans" or "performance improvement plans" ("PIPs").

32. Employees who, through "Performance Management" were forced into the bottom two buckets or placed on "coaching plans" and "PIPs," were the pool from which managers then would identify the ultimate target of "involuntary" terminations.

33. In addition to "Performance Management," Capital One engaged in some "restructuring" in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

34. Elsewhere in the private sector, where an employer requires a set percentage of

employees to be ranked as poor performers, this practice is commonly called "stack rankings." (*See, e.g.* Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

35. The problem with stack rankings is that employees who are objectively meeting all performance expectations are falsely rated as poor performers.

36. Falsely giving good employees poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy.

37. The Requirement that a fixed percentage of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and ultimately terminated.

38. Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates across all lines of business.

39. Through "involuntary attrition" of current employees, Capital One was making room for younger employees pursuant to a marketing, recruiting, and hiring campaign to attract recent college graduates.

40. At the same time that Capital One was implementing stack rankings to increase the rate of "involuntary" terminations, it was engaging in a marking, recruiting, and hiring campaign to attract recent college graduates to Capital One.

41. "Our No. 1 principle is to attract really talented people," [Capital One VP of Human Resources Judy] Pahren says. "We know our success is dependent on talent." Recruiting younger workers like millennials, she adds, "is key to that strategy." *See* Virginia Business

Magazine, The Rise of Millennials, November 2019.[1]

42. Capital One's effort to hire younger workers came through its Campus Recruiting Program ("CRP"), which focused on hiring only recent college graduates.

43. Within the past two years the CRP has been open only to college graduates in classes 2017 to 2021. Based on the general age of college graduates between the years of 2017 and 2021, Capital One has essentially set its hiring criteria to candidates in their early to mid-20s.

44. Currently, Capital One's website makes clear that its "Full-Time Programs" in the CRP are limited only to college graduates from the classes of 2019 to 2021. (https://campus.capitalone.com, visited December 22, 2020). The website directs anyone who graduated before 2019 to apply for jobs to Capital One's main site, separate from the CRP programs:



(https://campus.capitalone.com/full-time-programs/, visited December 22, 2020) (red circle

---

[1] Available at https://www.virginiabusiness.com/article/the-rise-of-the-millennials/ (last accessed Dec. 4, 2020).

added, link redirecting to https://www.capitalonecareers.com/search-jobs).

45. In order to make room for the new CRP recruits in their early to mid-20's, Capital One intentionally increased its "involuntary attrition" rate, that is the rate at which employees are involuntarily terminated from their employment with Capital One.

46. In order to increase its "involuntary attrition" rate and to make room for new hires in their early to mid-20's through the CRP program, Capital One required its managers to engage in the forced distribution, stack rankings, and issuance of "coaching plans" and "PIPs," under the guise of "performance management" as set forth above.

## Termination of Packett

47. Capital One's termination of Packett did not arise out of individual circumstances. It was a result of Capital One's mandate requiring managers to increase "involuntary attrition."

48. Capital One began implementing its policy to increase "involuntary attrition" sometime in 2017 and used both "performance management" and "restructuring" to carry out such terminations.

49. Packett was targeted for termination through both the "performance management" and "restructuring" methods of meeting Capital One's involuntary termination goals. Specifically, Packett was falsely accused of poor performance and placed on a Coaching Plan, but once it was clear that Packett was meeting her job expectations, Capital One changed its approached and terminated her, allegedly under a "restructuring" of her position.

50. Packett was the oldest person on her team.

51. In early 2018, Packett received a 2017 Year-End performance evaluation of "Inconsistent." This was the first unsatisfactory evaluation Packett had ever received in 20 years at Capital One.

52. Packett disputes the legitimacy of the rating she received for her 2017 Year-End evaluation. Packett's performance and her metrics were comparable to her years of previous performance in which she consistently met or exceeded Capital One's expectations. Packett's 2017 rating appeared to be, at least partially, based on factors beyond her own control or performance.

53. Based on her 2017 performance evaluation, Packett was placed on a Coaching Plan that was intended to run from March 19, 2018 to May 31, 2018.

54. While working to complete her Coaching Plan, Packett spoke with her Director, Tom McCormick ("McCormick") who was her boss's boss. Packett told McCormick she was concerned that her supervising manager, Walter Bowden ("Bowden"), was not keeping an accurate record of her progress under the Coaching Plan.

55. In response to her concerns, McCormick acknowledged Packett's performance was good and was meeting her plan.

56. McCormick made it known to Packett that he would try and vouch for her, but that his influence over such decisions was limited.

57. On May 8, 2018, before Packett could complete her Coaching Plan, Capital One told her that her job had been selected for elimination, or "restructuring."

58. Packett was terminated effective July 9, 2018.

59. It is believed that documentation in Capital One's possession will show that Packett was meeting the expectations of her Coaching Plan. Specifically, Packett's "NPS" measurements for her assigned site were exceeding expectations.

60. Accordingly, because Packett was close to successfully completing her Coaching Plan, Capital One could not easily justify terminating her based on performance and instead

pivoted to the justification of "restructuring."

61. Packett assumes that through McCormick's efforts, Capital One was able to classify Packett's termination as "restructuring" rather than performance based, which resulted in Packett receiving a more generous severance package than she would have received under a "performance" based termination.

62. Packett, at age 59, was the oldest member on her team, the Branded Card Servicing department. Capital One chose to eliminate one position from Packett's team which was comprised of five (5) employees. Although the other four team members were each over the age of forty (40), Packett was the eldest member by many years.

63. Capital One provided no objective data or rationale explaining why Packett's team, within the Branded Card Servicing department, was identified for restructuring or why the elimination of just one associate would satisfy the intended purpose of such restructuring.

64. Furthermore, Capital One provided no reason why Packett had been selected for elimination over the other members of her team.

65. Packett disputes the process used for restructuring her department and the conclusion that the elimination of her position was necessary.

66. Packett's termination under the justification of "restructuring" was done to meet Capital One's "forced distribution" requirement in order to increase involuntary attrition.

67. Packett was the oldest employee in her group at age 59. At the time her position was selected for elimination, Packett was successfully meeting the expectations of her Coaching Plan which had been unfairly issued to her.

68. At the time of her termination, Packett's site (for which she was responsible) was the best performing site based on objective metrics compared to other US Card sites.

69. Shortly after her termination, Packett saw a job posting for her position within the same group from which she was just terminated.

70. Following her "Inconsistent" rating, Packett began discussions with managers of other groups about transferring to a different role. Over the course of her 20 years at Capital One, Packett was aware that transfers were regularly approved at Capital One where an employee was having job issues. In early 2018, Packett was then made aware of Capital One's new "No-Transfer" policy for employees with an "Inconsistent" rating, and she was prevented from seeking any other position at Capital One.

71. At least two or more managers from different groups told Packett they would hire her, but were not allowed because of the No-Transfer policy.

72. Packett was selected for termination because of her age. But for Packett's age she would not have been selected for termination.

73. Upon information and belief, other older employees, who were also objectively strong performers, were also targeted and terminated by Capital One around the same time as Plaintiff.

74. Capital One's process and policy of increasing involuntary attrition in the manner set forth herein (through "performance management" and job eliminations), is a facially neutral policy that has a disparate impact on employees over age 40 across all lines of business at Capital One.

75. Such policy is an employment termination program under the OWBPA that affects two or more employees.

76. Upon termination of Packett, Defendants provided, and Packett signed, a Letter of Agreement ("Agreement") which provided her severance pay in exchange for waiving certain

claims against Defendants. Capital One has a copy of this Agreement which is substantially similar to the Agreement in *Hutchens v. Capital One*, Case No. 3:19-cv-546 (ECF No. 1-1).

77. Upon termination of Plaintiff and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided.

78. Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

## Count 1 – OWBPA

79. OWBPA claims may not be released.

80. ADEA claims may not be released unless they comply with the OWBPA.

81. Capital One's Letter of Agreement did not comply with OWBPA.

82. The policy alleged herein was an "employment termination program" affecting two or more employees.

83. The Agreement provided to Plaintiff and others did not provide 45 days to consider the waiver of any rights or claims under the ADEA.

84. The Agreement provided to Plaintiff and others did not provide the job titles and ages of all individuals selected or not selected for termination under such policy alleged herein.

85. The Agreement was not a "knowing and voluntary" waiver of Plaintiff's rights and claims under the ADEA.

86. Plaintiff is entitled to declaratory, equitable, and/or injunctive relief based on Capital One's OWBPA violation including but not limited to: age and job title data across the applicable line(s) of business, data reflecting "involuntary attrition" rates, other statistical data relating to these claims; an order declaring Capital One in violation of OWBPA and permitting

Plaintiff to proceed with her claim under the ADEA, without retaliation and without being in breach of the Letter of Agreement; an award of attorneys' fees and costs; and other equitable, injunctive, and/or declaratory relief requested below.

87. The party asserting the validity of an OWBPA waiver has burden of proof that it was "knowing and voluntary." 29 USC § 626(f)(3).

88. Capital One cannot prove that the Agreement was knowing and voluntary.

### Count 2 – ADEA

89. Capital One discriminated against Packett because of her age, 59.

90. Packett was initially targeted for termination by Capital One through use of "performance management" in which she was falsely alleged to be a poor performer. Packett's boss's boss confirmed that she was not a poor performer. Packett's job was later eliminated, or "restructured," and she was prevented under the "No-Transfer" policy from transferring to another department. At the time of her termination, Packett's job site (for which she was responsible) was performing better than others in her department. Shortly after her termination, Packett saw an advertised posting for her job.

91. But for Packett's age, her position would not have been chosen for elimination.

92. Capital One disparately treated Plaintiff and other older associates, and treated younger employees more favorably, in the forced ranking, terminations, and/or job eliminations of older employees.

93. Capital One's disparate treatment of Plaintiff and older employees was willful.

94. Capital One's policies also had a disparate impact on older employees. Specifically, Capital One's policy to increase the rate and percentage of "involuntary attrition," which was implemented through a "performance management" policy which required forced or

"stack" rankings to create a pool from which "involuntary" terminations were implemented, was the standard operating procedure at Capital One. This policy had a disparate impact on Capital One employees over age 40. The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including CRP hires.

95. Plaintiff was disparately impacted because of her age by Capital One's policies which resulted in her termination.

96. Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

97. Given Capital One's "best people philosophy," which involves hiring the "best talent in the industry," Capital One's policy of using "forced distributions" under the guise of "performance management" in order to increase "involuntary" terminations was implemented willfully with the intent to eliminate employees over 40 years of age while increasing hiring of younger employees. Alternatively, it was a neutral policy that disparately impacted employees over 40.

98. The "No-Transfer" policy also contravened Capital One's stated "best people philosophy" in that it was used to prevent good employees – who Capital One considered the "best" when hired and who now were being targeted for termination through "performance management" and/or "restructuring" – from transferring to another position within Capital One. The "No-Transfer" policy was implemented in furtherance of Capital One's goal to increase "involuntary" terminations. This policy was implemented willfully with the intent to eliminate employees over 40 years of age while increasing hiring of younger employees. Alternatively, it was a neutral policy that disparately impacted employees over 40.

**Relief Requested for OWBPA**

Wherefore, Plaintiff requests the Court grant the following Relief:

    A.    Issuance of an Order finding that Capital One did not comply with the OWBPA;

    B.    Declaring that Capital One's policy, as alleged herein, was an "employment termination program" under OWBPA;

    C.    Declaring that the "Letter of Agreement" does not comply with the OWBPA, that the waiver contained therein was not "knowing and voluntary," and that Plaintiff may proceed with her ADEA claim;

    D.    An Order directing Capital One to comply with OWBPA, including producing the ages and job titles of employees who were selected and /or non-selected for termination under the policy alleged herein, which should have produced under OWBPA;

    E.    An Order directing that notice be delivered to all Capital One employees involuntarily terminated under the policy alleged herein, who received a Letter of Agreement, informing them that their waivers are invalid and that those employees may have ADEA claims;

    F.    attorneys' fees; and

    G.    any and all further relief permissible by law.

**ADEA Relief Requested**

Wherefore, Plaintiff requests the following Relief against Defendants:

    A.    Court order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management calibrations, forced rankings, involuntary terminations, new hires, and any other

employment data relevant to Plaintiff's disparate impact claim;

  B. money damages suffered by Plaintiff as a result of Capital One's age discrimination of Plaintiff, including but not limited to lost pay, benefits, and the difference in severance benefits between Capital One's "Performance Benefit Structure" which Plaintiff received, and the greater sum of the "Restructuring Benefit Structure" which Plaintiff should have received as a result of the policy alleged herein;

  C. liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violations of the ADEA;

  D. pre-judgment and post-judgment interest;

  E. reasonable attorney's fees and costs expended in the prosecution of this case;

  F. any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this case.

          Respectfully submitted,
          **Kathy Packett**
          Plaintiff

         By: /s/
          Harris D. Butler, III (VSB No. 26483)
          Craig Juraj Curwood (VSB No. 43975)
          Paul M. Falabella (VSB No. 81199)
          BUTLER CURWOOD, PLC
          140 Virginia Street, Suite 302
          Richmond, VA 23219
          Telephone: (804) 648-4848
          Fax: (804) 237-0413
          harris@butlercurwood.com
          craig@butlercurwood.com
          paul@butlercurwood.com
          *Attorneys for Plaintiff*